## A. L. THURMOND, Jr., v. STATE.

No. A-8822. July 19, 1935.
As Corrected Aug. 20, 1935.
(48 Pac. [2d] 845.)

David Tant, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Smith C. Matson, Asst. Atty. Gen., for the State.

DAVENPORT, P. J.   The plaintiff in error, hereinafter referred to as the defendant, was by information charged with murder in two counts; was convicted on the second count of manslaughter in the first degree and sentenced to serve a term of four years in the state penitentiary.

The information, omitting the caption and signature of the county attorney, is as follows:

"In the name and by the authority of the State of Oklahoma, comes now Lewis R. Morris, the duly qualified and acting county attorney in and for Oklahoma county, State of Oklahoma, and on his official oath gives the district court in and for said Oklahoma county and the State of Oklahoma, to know and be informed that heretofore, to wit: on or about the 23rd day of August, A. D. 1933, in Oklahoma county, State of Oklahoma, A. L. Thurmond, Jr., whose more full and correct name is to your informant unknown, then and there being, did then and there wilfully, unlawfully and feloniously commit the crime of murder in the manner and form as follows to wit:

"First Count

"That is to say, the said defendant in the county and state aforesaid, and on or about the day and year aforesaid, then and there being, did then and there while under the influence of intoxicating liquor, willfully, unlawfully and feloniously run, drive, propel and operate a certain automobile, to wit: a 1933 Buick coupe upon and over a certain public street in Oklahoma City, said county and state, commonly known as West Grand avenue, at a high and dangerous rate of speed, and in a reckless and careless manner, while under the influence of intoxicating liquor, and operating said automobile as aforesaid, he, the said defendant did, where Grand Avenue, in said Oklahoma City intersects Hudson street, unlawfully, wrongfully and feloniously drive into and strike one M. K. Beam, who then and there was attempting to cross Grand Avenue, with such force and in such manner as to then and there

and thereby inflict upon the body of the said M. K. Beam certain mortal injuries so inflicted as aforesaid, from which the said M. K. Beam did instantly die, contrary to the form of the statutes in such cases made and provided, and against the peace and dignity of the State of Oklahoma;

## "Second Count.

"That is to say, the said defendant, in the county and state aforesaid, and on or about the day and year aforesaid, then and there being did then and there unlawfully, willfully, wrongfully and feloniously run, drive, propel and operate a certain automobile, to wit: a 1933 Buick coupe upon and over a certain street in Oklahoma City, said county and state, commonly known as West Grand Avenue at a high and dangerous speed and in a reckless and careless manner imminently dangerous to others and evincing a depraved mind, regardless of human life, and while so driving said automobile as aforesaid, he, the said defendant, did, where Grand Avenue in said Oklahoma City intersects Hudson street, unlawfully, wrongfully and feloniously drive into and strike one M. K. Beam, who was then and there attempting to cross Grand Avenue, with such force and in such manner as to then and there and thereby inflict upon the body of the said M. K. Beam certain mortal injuries so inflicted as aforesaid, from which the said M. K. Beam did instantly die, contrary to the form of the statutes in such cases made and provided and against the peace and dignity of the state of Oklahoma."

The defendant was placed on trial on both counts in the information, and the court instructed the jury fully as to the allegations in the first count charging the defendant with driving a car at a high and dangerous rate of speed, and in a reckless manner, while under the influence of intoxicating liquor; and also on the second count as to the defendant driving at a high and dangerous speed, and in a reckless and careless manner, imminently dangerous to others, and indicating a depraved mind regardless of

human life. The court further instructed as to manslaughter in the second degree, advising the jury that a killing by the act, procurement or culpable negligence which is not manslaughter in the first degree or excusable homicide is manslaughter in the second degree. The jury, after hearing the evidence and instructions of the court, failed to find the defendant guilty on the first count in the information, or of manslaughter in the second degree, but returned a verdict of manslaughter in the first degree on the second count.

The question now to be decided by this court is: Is the evidence relating to the second count in the information sufficient to sustain the verdict and judgment of the court, and was the defendant accorded a fair and impartial trial as guaranteed to him by the Constitution and laws of this state?

The accident that caused the death of M. K. Beam occurred at the intersection of Grand avenue and Hudson street, Oklahoma City, Oklahoma county, Okla.

The first witness testifying for the state, a Mr. Crawley, stated:

"I am 36 years of age; on August 23, 1933, I was employed by the Y and Y Cab Company; about 12 or 12:30, on the 23d of August, 1933, I answered a call to the Colcord building, on Grand avenue; I was going west on the north side of Grand avenue, when a beige colored Buick coupe passed me on the north side of the center of the street, at a speed estimated at about 30 miles per hour or faster; I had just passed Harvey street on the north side of the street car track; I picked up my passenger intending to go west to Walker, but on account of the jam at the corner I decided to make a left turn at Hudson; I looked up and saw a man lying in the street about where the street car tracks turn in the center of the street; had

to turn my wheels real quick to keep from hitting him; I turned south and was almost stopped at that time; the Buick coupe darted north; I don't know if the driver of the Buick got out of the car; I went on and delivered my passenger and when I got back they were washing up blood from the street; the Buick car when I noticed it was headed toward the Black Hotel, and just before I got there it started north, it could not have been more than 30 seconds; I was not acquainted with the deceased, and did not know A. L. Thurmond, Jr., at the time.

"I was just west of Harvey when the Buick car passed me going west on Grand avenue; at the time I was driving between 20 and 25 miles per hour; I guessed at the rate of speed the car was making that passed me; I could not positively say how fast it was going; it was going at least twice as fast as I was going; I was just guessing at my speed. I had driven about a block and a half when I heard the crash; we are allowed 25 miles an hour and I usually crowd it pretty close; there were no other cars on the street at the time that I saw; two cars were parked in front of the hotel, and a private car was standing in front of the interurban station; I did not see the car strike Mr. Beam; I did not know any one had been struck until I saw him lying in the street; the defendant was standing still in Hudson street when I drove up; somebody said, 'Don't let that man get away.'

"Immediately after the Buick car passed me the car or brakes or something started to scream; I was about 75 feet behind the Buick car from the terminal building up Hudson street; my speed was from 20 to 25 miles per hour; when I heard somebody say, 'Stop the man, don't let him get away;' there was three or four men moving toward the Buick car at the time. The Buick car was standing still; after I heard them hollow a man started toward the car, and that is when he drove off."

E. M. Fisher, testifying on behalf of the state, stated:

"I am 21 years of age, married, and have been working for the Grace Cleaners, at 326 West Grand, for about a

year; was there on August 23, 1933, working at night; shortly after 12 o'clock I was standing in front of our place of business; I heard squeaking of brakes.

"Mr. Morris, county attorney: Mr. Fisher, you will have to talk louder.

"The automobile I saw at the place indicated, was going pretty fast; I don't know whether it was 35, 40 or 45 miles; I did not know what kind of a car it was at the time but learned it was a Buick; saw Mr. Beam crossing the street; did not know his name at the time; he had passed in front of the shop going west, he did not go down to the corner, he turned about 15 feet west of our door; I don't know how far it is from our door to the corner; there are two hotel entrances, the building is about the same width; the man turned about here (indicating on a map) and went across the street."

At this juncture the assistant county attorney, Mr. Grigsby, asked the witness:

"Q. You talked to me day before yesterday about this situation? A. Over the phone. Q. No, at your place of business? A. No, not that I know of."

Many other questions were asked by the county attorney with reference to a conversation the witness should have had with some one of the state officers:

"Q. You saw the auto strike the man? A. Yes, sir. After the car struck the man it swung around and hit a taxi; I did not know it was the Thurmond car at the time; the car then backed out and went north on Hudson."

On cross-examination, witness stated he was standing in front of the shop on Grand avenue, and Mr. Beam cut across, going in a northwesterly direction; the car that hit Mr. Beam was on the north side of the street car tracks on Grand avenue—

"I believe I saw a car going west on Grand avenue; I saw a car on Hudson come from the south into the intersection; when I first saw the car that hit Mr. Beam it was just east of the terminal tracks as they turn into the terminal going west towards Hudson street. Mr. Beam was lying where a street car track stops, at the intersection of Hudson street and Grand avenue; I could not see from where I was standing where the car struck Mr. Beam; it seemed to me he was walking at a pretty fast pace; just before the car struck him he changed, he stopped and kindly hunkered, then lurched forward; he was going northwest and turned west, he then faced back north, lurched forward and increased his pace; the coupe was going between 30 and 45 miles per hour."

On re-direct examination, witness was asked if he did not recollect talking to the county attorney, and that he told him 50 or 60 miles an hour.

"Question by Mr. Grigsby, assistant county attorney: You recollect you told me 50 or 60 miles an hour? A. No, sir. Q. You did not make that statement to me? A. No, sir. Q. You did not tell me the man went by the corner and turned across? A. No, sir. At the time this man was struck there was a car coming east on Grand avenue and one going north on Hudson; the car that struck him was going west on Grand; I did not know at the time who was driving the car that struck Mr. Beam; the car that was going north on Hudson turned to the right and went west on Grand and another car was going east on Grand; I went in and called an ambulance; did not go out to the injured man; I was at the shop by myself at the time. Grace Cleaners are open all night and all day."

Several other witnesses who heard the crash and saw the man after he was struck testify as to the action of the defendant after he struck the taxicab, showing some of the witnesses got his license tag number; while they were getting the tag number the defendant asked them to call an ambulance.

A witness for the state, J. W. Wallace, stated he remembered the night M. K. Beam was killed at the intersection of Hudson street and Grand avenue— "I was there that night." In describing the crossing of the street, Wallace stated:

"Pedestrians usually walk across here (indicating on a map) and some cut across the corner; they don't always go directly across the street; my car was parked on the north side of the street between the stop sign and the corner; I was standing next to the hotel entrance in a doorway; I saw a car coming, but did not notice the color until after the accident; I saw the car hit the man: he was about opposite the entrance to the Anchor Hotel by the drug store; I saw this man along here (indicating on a map); he walked about this way to the curbstone, stood there a few minutes, and it looked like he was going to turn across; he went back like he was going to the drug store, the entrance of which is on the corner; he then walked on, but I don't know whether he went down to the Grace Cleaners or not; later I noticed a man going across the street, I would say from the east side of the building in which the drug store is located; he stepped off the curb and I paid no more attention to him until I saw him on the north side of the street car tracks, in or close to the lane for pedestrians; as the car approached that struck him he made sort of a run to get across, made a step and then backed back, made a second step forward, and made a step or two the other way like a fellow will do in haste, trying to get away—at this time he was only about 15 to 18 feet from the Buick car; there were tracks to show the brakes went on before it hit my car; the tracks showed all four wheels had been set; the street had been washed and the frogs were full of water and cars passing back and forth kept the street washed, and you could not tell one track from another; in fact I argued with the officer which track was which.

"The man was about crossing the street car tracks when I first observed him; after the man was hit I went

out to where this car had stopped in the intersection when he put on his brakes where the collision took place, and it looked like it went around to the right; in turning and putting on the brakes his car turned into my car; the car was going like it was going to make a turn toward the curb so as to sorter dodge—pulling in closer than if he would be going straight, and the car hit my car at the rear and turned sidewise like this (indicating)—when the car stopped after it hit my car it was approximately facing north; I went out and spoke to the man and went around and got his tag number; he said to call an ambulance; I called another man driving a cab and told him to call an ambulance; he told me to call an ambulance before I got his tag number, and told me again, I believe he told me the third time; I know positively he told me twice; I went over to where the man was lying, and the car drove away; I called the police station and reported the accident. I did not notice the man was under the influence of liquor; he talked like a man that was sober; I do not think he was drunk."

On cross-examination witness Wallace stated Thurmond was driving straight when he first saw them, and swerved a little to the side; to the right, toward the curb when Mr. Beam began dodging back and forth, apparently in an effort to avoid hitting Mr. Beam.

"I know Mr. Beam balanced back and forth three or four times and he went back toward the center or south side of the car when he was hit; he seemed to be confused; his making the movements is what attracted my attention; I had observed him crossing the street; I did not see him go up to the corner and come back to the east and start across the street; I did not observe him any more until I saw him dodging; he was crossing the street in a way that is commonly known as jay-walking. I think I am competent to tell whether a man is drunk or under the influence of intoxicating liquor; when I spoke to the defendant at the time of the accident I did not see anything to attract my attention in that respect; he sat erect in his car

and told me twice or on three occasions to call an ambulance."

Mr. Morris, the county attorney, on redirect examination propounded many questions to his witness; among other things, he wanted to know if the witness had ever told any one that defendant had told him to call an ambulance two or three times, and witness answered, "I think so, because it is an established fact that I did."

The record further shows that about the time he asked them to call an ambulance, parties began to call out, to "get that man, and don't let him get away," and defendant backed his car out in the street and drove north on Hudson street.

The record is quite lengthy, the testimony on behalf of the state attempting to show the defendant was intoxicated at the time of the accident, a number of witnesses testifying they smelled his breath and that it had the odor of whisky; some of the witnesses testifying did not see the defendant until about 4 o'clock in the morning after the accident occurred around 12 to 12:30, stated they smelled the odor of alcohol on his breath. A doctor testified he was at the police station about 6 o'clock the next morning after the accident occurred and he smelled the odor of whisky on his breath.

In the introduction of the testimony on behalf of the state, the state at length introduced testimony showing that when the defendant went to the police station, to report, as he claimed, his car had been stolen, he was detained by the officers, and while so detained he refused to give them a statement about the accident, or to make any statement, or to sign any statement. The record shows one statement was prepared by an evidence man and others;

the defendant glanced over it and tore it up; another was prepared and he crushed it and pitched it in the waste-basket.

It is further shown that while he was detained at the police station he asked to see a lawyer and to communicate with his family, and was denied that privilege.

The defendant introduced testimony to show he had been with a number of friends the afternoon and evening before the accident occurred, and that he was not intoxicated; he had had dinner at home with friends and they had gone different places and he had not drunk anything but two or three bottles of 3.2 beer.

The defendant testified in his own behalf detailing at length his movements the afternoon and evening prior to the accident and denied he was drunk or that he had been drinking any intoxicating liquors, in detail telling how he happened to be on Grand avenue; that he was driving at a rate of 25 to 30 miles per hour; when he got near the intersection of Grand and Hudson there were several cars passing one another and his attention was attracted to the cars, and when he discovered the deceased walking in the middle of the street, he set his brakes; that the street had been recently washed and was wet and he could not stop or avoid striking the deceased; after he struck deceased his car bounced around and collided with a taxicab that was on the side of the street; some one came to the car and he told them to call an ambulance; the party went on around the car, and some one hollowed, "Get that man, don't let him get away," or words to that effect, and he feared personal violence and turned his car and drove up Hudson street and on to his home.

The defendant admits he ran the car he was driving into the garage, took his father's car and chauffeur and

drove to Shawnee and back, arriving at home in the early morning before daylight; he found his car had been taken out of the garage and drove to the police station to report it as stolen when he was taken into custody and detained by the officers, the officers refusing to let him call his family, or an attorney. Defendant admits the officers tried to get him to make a statement and he refused to do so. He denied he was intoxicated at the time of the accident, and denies that he was driving at a greater rate of speed than 25 or 30 miles per hour. Defendant further denies he was driving in a reckless manner or at such a rate of speed as to endanger the lives of others.

Miss Mary Jane and Lois Olga King, and Chris King, each testify they were with the defendant the evening before the accident shortly after midnight, and they testify positively that defendant was not intoxicated and had not been drinking anything but some beer.

Opal Woden, testifying for the defendant, stated:

"I was employed at the Veazey Drug Store, at Eighteenth and Classen, on the evening prior to the alleged accident; I know A. L. Thurmond, Jr., and the King sisters; Mr. Thurmond, the King sisters, and Chris King came to the drug store, first Mr. Thurmond and Olga King drove up, and I went out to serve them and Mr. Thurmond asked me to wait, as there were other parties coming; shortly thereafter Chris King and Miss King came and got in the car and I took their order; I was on the driver's side of the car; they were in a Buick coupe, with Mr. and Miss King in the rumble seat; I talked with Mr. Thurmond, and he was not drunk or under the influence of intoxicating liquor."

On cross-examination the assistant county attorney, Mr. Grigsby, sought to show that the witness had made a statement that Mr. Thurmond was not at the drug store

the evening testified to by her, and questioned the witness at length seeking to establish by her that immediately after the accident she decided that Thurmond was sober.

"Question by Mr. Grigsby, assistant county attorney: You did not tell anyone he was sober? A. Sure, I did. Q. Who did you tell? A. Some policemen came out and questioned me the following night, I would not know who they were. They stopped me on Western, I was walking home. That is, two policemen spoke, I would say about two, I imagine there were five or six in the scout car. Q. Stopped you, where? A. On the corner of 12th and Western, I believe, about a filling station. I had not seen the policemen before that I know of. I was going home from work. Q. How were you dressed that night? A. I don't remember. Q. I mean did you have on your apron? A. No, sir, had on my street clothes; it was about 11:30 the following night after the accident; one of the policemen got out of the car and stopped me and told me they had been to the drug store and the employer told them I had started home. I told the policeman what I knew about Mr. Thurmond being at the drug store and that he was sober; I got acquainted with Mr. Thurmond about seven months prior to this time; he was a customer at the drug store and had a charge account; I have never seen him intoxicated. Q. You noticed that? A. I did not notice anything else. I had not remarked to anyone that night that he was sober. My recollection is that while at the drug store that night he drank a bottle of 3.2 beer; I do not remember the brand, the drug store carries several different brands; I do not know what direction he came from; Mr. Thurmond was driving the car; I did not see him leave; I served them from the driver's side of the car as it was nearest the entrance to the building; I did not smell anything on his breath; I was close enough to take the order, up to the door of the car, standing as near the running board as I could."

The record further shows that before the defendant closed his testimony Opal Woden was recalled for recross-

examination by the state, and was questioned at length as to what she told the police officers the following night after the accident which caused the death of Mr. Beam. Among others, the following questions were propounded to the witness:

"Q. I will ask you if these officers did not ask you if Mr. Thurmond was not at the drug store where you worked that night, and you stated you did not see him? A. No, sir. Q. And if that officer was not Cliff Miers and Mr. Claud Tyler was present in the car when the conversation took place? A. I did not know the man. Q. Did you tell him Thurmond was not out there and that you did not see him? A. No, sir. Q. And you did not wait on him? A. No, sir."

The record discloses that since she had testified for the defendant on the day previous, she had been introduced to a man by the name of Cliff Miers, and that she had also met a man by the name of Claud Tyler.

"Q. When did that meeting occur? A. This morning. Q. Were you sent for? A. Yes, sir. Q. Those four people were there? A. Yes, sir. Q. Tell the court all that occurred; all that was said? Mr. Grigsby: Objected to as incompetent, irrelevant and immaterial; that has nothing to do with this case. Mr. Arnold: Yes, it has, they are going to bring the same two people in here; they have laid the predicate for impeachment. Mr. Grigsby: No, if the court please, we are not proving what was said upstairs, we are proving what she said to these officers out there, we wanted her to see these officers and she saw them."

The record contains several questions, answers, and remarks of the court; among others, the following were made by the court:

"A foundation for impeachment could have as well been laid then as now, if that is the purpose of it. I will

give her an opportunity to tell what occurred. Mr. Grigsby: What occurred in the county attorney's office? The Court: Yes, sir, I think so, it probably ought to be surrebuttal."

Again an objection was made by Mr. Grigsby, the county attorney, and an effort made to prohibit this girl from telling what took place when she was taken to the county attorney's office and confronted by the two officers, the county attorney, Mr. Morris, and Mr. Grigsby, assistant county attorney. The court advising the attorneys for the defense they could reach that later on. The state then called several witnesses, tending to show defendant had been around the Black Hotel the evening before the accident, and attempted to contradict other witnesses who had testified, and after the state rested in rebuttal, the defendant called Miss Opal Woden and developed the following facts: That she was called to the county attorney's office by some representative from the county attorney's office. The county attorney objected to the defendant going into that question, insisting that it was incompetent, irrelevant, and immateral, and not proper surrebuttal, the county attorney stating the whole testimony was she was called back and conferred with.

"The Court: The officers testified to it, and it would be one cross firing another, and it would be a matter for the jury to determine. Mr. Tant: Now, in going into all these details while I was in the county attorney's office visiting Mr. Miers, the man who was there talked with me and said he was the man that talked to me on the street relative to the Thurmond matter; he said the girl that was there the night he went to the drug store told him she was the girl that served Mr. Thurmond. Q. Did you tell him you did? The Court: It is not incompetent but is repetition."

Again the defendant's counsel asked a question. The county attorney objected. "Now, after all the conferences in the county attorney's office, have you changed your mind about the testimony?" Objections were made; statements from the court that the question becomes argumentative; after the objections back and forth by the county attorney, the witness was excused.

The record is voluminous, and it would serve no useful purpose to set it out in full. Many pages are filled with testimony not applicable to the crime charged, immaterial, and seemingly introduced for the purpose of trying to arouse bias and prejudice in the minds of the jury. Later on in this opinion, we will refer to the question of evidence and the manner in which the examination of witnesses was conducted.

The defendant has assigned ten errors alleged to have been committed by the trial court, as follows:

"1. The court erred in overruling the demurrer of the plaintiff in error to the information filed herein.

"2. The court erred in overruling the demurrer of the plaintiff in error to the evidence introduced by the state.

"3. The court erred in refusing to grant the plaintiff in error a continuance of said cause.

"4. The court erred in refusing to give the requested instructions of plaintiff in error.

"5. The court erred in giving to the jury instructions numbered 6, 7, 8, 9, 11 and 12.

"6. The verdict of the jury is not sustained by sufficient evidence.

"7. The verdict of the jury is contrary to and in disregard of the court's instructions.

"8. Errors of law occurring at the trial and excepted to by plaintiff in error.

"9. The court erred in permitting the state to introduce incompetent, irrelevant and prejudicial testimony.

"10. Misconduct of the assistant county attorney, Mr. Draper Grigsby, in making prejudicial remarks to the jury, and excepted to by the plaintiff in error."

The defendant in his ninth assignment urges that the court erred in permitting the state to introduce incompetent, irrelevant, and prejudicial testimony.

A careful examination of the record presents a peculiar effort upon the part of the prosecuting attorney not followed up by testimony, showing conclusively that it was the desire and ambition of the prosecuting officer to try, if possible, to impress upon the jury the fact that the witnesses were not telling the truth. In one or two instances, a witness who was not testifying apparently to the satisfaction of the prosecuting officer was asked, "Didn't you tell me the car was going sixty miles per hour?" and the witness answered "No." Several other witnesses were asked similar questions and answered they had not made such statements to the prosecuting officer. Many others were asked if they had ever reported to any one they had seen the accident, and when they stated they had not, then the prosecuting officer would go into questions as to statements they had made contrary to what they testified to. In each of these instances the testimony was closed, and no effort was made by the state's attorney to show that the witness had made the statements to him or other parties inquired about, thus leaving the question before the jury that in the mind of the county prosecutor the witness had made the statements inquired of, without any testimony except the questions of the county prosecutor. This

kind of procedure cannot be approved by this court. When the county prosecutor interrogates a witness as to conflicting statements made to him, or to other witnesses, if the witness denies the fact, the county prosecutor should be in a position to offer proof upon those questions; otherwise the questions should not be asked.

In the testimony of Miss Opal Woden, who was a clerk in the Veazey Drug Store at Eighteenth and Classen, on testifying for the defendant, she stated that the defendant was at the drug store at a certain hour the night of the accident and a short while prior thereto, and that she did not smell any intoxicating liquor on his breath. She also stated that as she was leaving her work the following night a police car drove up and stopped her, and one of the officers got out and asked her if she had seen the defendant at the drug store the previous night, and she says she told him that she had, and that he was not intoxicated; and she served drinks to his party. The record further discloses an unusual act upon the part of the county prosecutors: After Opal Woden had testified, without notice to defendant's attorney or himself, Opal Woden is sent for and taken to the county attorney's office and confronted by the officers whom it is claimed were the ones that talked to her on the night after the accident, and the county attorney and Mr. Grigsby, an assistant. It is needless to say why Opal Woden was taken to the county attorney's office and confronted by these officers in the presence of the county attorney and his assistant, Mr. Grigsby, after she had testified, but any unbiased, thinking person would believe it was done for the purpose of trying to intimidate her and cause her to change her statements made while on the witness stand. If not for that purpose, why was she taken to the county attorney's office? Those officers had the

opportunity of seeng her at the courtroom and knew as well at the time she was taken to the county attorney's office and confronted by them what she had told them, as they did after they had seen her on the street the night they talked to her. It was not a question of the officers identifying the witness, because she had admitted they talked to her. Only the question of contradiction was involved, and this court holds that the county attorney and his assistant, in their zeal to try to contradict and break down the testimony of the witness, Opal Woden, should not have taken her to the office and there, in the absence of the attorney for the defendant and defendant, confronted by the officers who were afterward called to testify and to contradict the testimony of the witness, Opal Woden.

The tenth assignment relates to the misconduct of the assistant county prosecutor, Mr. Grigsby, in making prejudicial remarks to the jury regarding the defendant, his character and habits, and his actions after the accident.

Among other things, the assistant county prosecutor, Mr. Grigsby, said:

"This is a hit-and-run driver. I don't care what the evidence in the case has shown for the defendant or for the state. The facts are, this is a hit-and-run driver. You have heard of the hit-and-run driver. You have heard him talked about. He is here before you. He is here with his array of counsel. He has come to a court of justice prepared to meet the state's witnesses. Mr. Arnold (interrupting): If the court please, I wish to object to counsel's remarks as to what they have heard about him and what they have read about him. The jury promised not to consider that. It is prejudicial. The Court: We will try to confine ourselves to the explanations of the evidence. Mr. Grigsby: I expect to be interrupted quite

often in this argument. Mr. Arnold: We object for the same reason. Mr. Grigsby: I don't expect to get to say much to you due to the fact of the objections of counsel—Mr. Arnold (interrupting): We make our objections. He may put them in at the end of the argument. The Court: It is the duty of the attorneys on either side in the argument to confine themselves to the facts and draw such inferences as you think proper and right, and whenever that is done, all right. Mr. Grigsby: May I proceed without interruption? The Court: I hope so. Mr. Grigsby: I hope so. Mr. Arnold: May I have an opportunity at the close, I don't want to have to get up here continuously and make objections, and if I may make them so we can keep our record. Mr. Grigsby: I expected this. I expected it when I saw Mr. Hommedieu as a witness. I knew that this was going to be a trial that I had never sat in the like before and it has been. The state of Oklahoma has to fight every inch of the way to get what it got. I want to say to you at the outset of my argument that until he took the witness stand, under the evidence in this case, he never told a living soul, not an officer, not a prosecuting attorney, not a policeman, that he ever— Mr. Tant (interrupting): Just a minute. Mr. Grigsby (continuing): —killed M. K. Beam. I expected this interruption all the way through. Mr. Tant: Yes, you are going to get it until you confine yourself to the record. You are making statements outside the record and not according to law. Mr. Grigsby: That is the evidence. I challenge the record. The Court: I didn't think you were out of the record, but I will allow the exception. Mr. Tant: He states the defendant never made a statement. Mr. Grigsby: I am saying what he didn't do. There is no use continuing the argument on behalf of the state. They are taking the record and can take their exceptions and I think the state is entitled to that much consideration. I know he doesn't want us to argue this case. Mr. Tant: We except to those remarks because we have the same right to make objections and the Criminal Court of Appeals has held that if we don't make them at the time we waive them. Mr. Grigsby:

You can have an objection to each and every word I say. Will I be interrupted? The Court: I hope you will not. I said that before. Mr. Grigsby: I think the court can control this situation. I think the court has the power. The Court: I can't keep them from objecting. I can overrule the objection. Mr. Grigsby: It is useless for the state to argue this case if we have got to be continually interrupted. Mr. Grigsby (in reply to statement of the court) : I know I am not. I have argued a thousand cases and I know what the purpose of this objection is. Mr. Tant: We save an exception to all of these remarks. The Court: Exceptions allowed."

Mr. Grigsby, further in his remarks, said:

"He wants counsel. Does an innocent man need counsel in a criminal case if he is innocent? Do you need counsel if you are not guilty? I ask you to reason that in your minds. Do you need counsel if you did not commit the crime? Why is it necessary that you demand counsel if you are innocent and the man jumped in front of you and your car was in the garage at nine o'clock? I ask you why do you need counsel to do your talking for you when you have gone through highschool and to the university and majored in finance? You, who had majored in finance, you who had a silver spoon in your mouth since you were born, had every advantage— Mr. Tant (interrupting) : We object to that remark as prejudicial, incompetent, irrelevant and immaterial and not within this record. The Court: Overruled and exception allowed. Mr. Grigsby: Did we have a word from him? And I say to you as men of ordinary intelligence in life, that this is the instinct of a criminal. They wrote one statement for him. They gave it to you (referring to the defendant) and you tore it up. They wrote another one and you tore it up. The last one he did not tear up. I told you he is a common criminal; he is nothing else. When that car crashed into that body, knocked it 30 feet in the air, even Hommedieu did not change his testimony on that. Let us go on and see what kind of a man you are dealing with. I said he was a common hit-and-run driver and I don't re-

tract my statement. I don't know how many counsel he may employ or how many he has employed. I still say he is a common criminal with the instincts of a hit-and-run driver. Did you help to pick up that lifeless thing and put it in the ambulance and let science try to bring it to life? No, you didn't do anything. You are the same as an Al Capone gangster. You kill them and let them lay where they fall. Mr. Tant: If the court please, I object to that line of argument. I don't want to interrupt, but it is an effort to attack the character and reputation of this defendant. The Court: Overruled and exceptions. Mr. Grigsby: The officers were looking for him, and this little idol, this little pure man, did he tell the officers; did he tell anybody that he was the one? The answer, the echo is 'No,' and I say to you that he has the instincts of a criminal. You, majoring in finance, called a lawyer, but a criminal says mouthpiece, and mouthpiece means lawyer. Give me a mouthpiece. I won't say anything. I say the common instinct of the criminal is the same, whether they wear a double-breasted suit or trick mustache or a tuxedo or overalls. It is the same. Give me a lawyer. Why is it that a man that is innocent asks for a lawyer? An innocent man never needs a lawyer. They never get to a jury. Only the guilty get to a jury. Call him a lawyer. He wanted a lawyer to say what he did. He wanted a lawyer to plead his cause, to tell you why he knocked that man 30 feet, that body rolled over and over, when the blood was running out of his mouth, nose, eyes and ears, he wanted a lawyer to tell why he did it. Turn him loose, let him go back to the upper strata. Say to the man who has education, majoring in finance, teller in a bank, you can kill them; you can run over them. I don't want you to write a verdict of not guilty, but you would have the approval of the hit-and-run drivers, and that is what you did. Just a common hit-and-run driver with the instincts of a common criminal; they are there. I want to tell you this is the most arrogant, egotistical individual I ever saw in the courtroom. He took the witness stand under the direct examination of Ben Arnold and said he lied to the officers, lied to Mr. Cassidy. The jury is with me. Lied to Mr.

Cassidy? Like it? He lied to them. What are you going to do about it? I know you are not going to turn him loose because no reasonable body of men will believe all of the story he put up here, but you are liable to go out here and say, what about a fine? If you have got any idea of fining him—I am just talking as your agent; I am subject to being fired in five minutes. Lewis Morris can come in here and say 'You are fired.' I am through. I go to represent these hit-and-run drivers. Are you going to slap him on the wrist with a fine? I can almost pick out the foreman, but I am not; I might make the rest of you mad. Hommedieu makes a statement of 50 or 60 miles an hour. Hommedieu didn't even identify you. What changed Hommedieu? What made Hommedieu with his trick mustache change? What made Fisher change? Is it because you were rudely detained?

"A verdict in this case of not guilty means greed. Greed has usurped human rights. You did not know M. K. Beam. You never saw him, but you are just like a common criminal who kills and leaves his victim dying. Listen, I have defended these fellows. I have gone down and wanted to make their bonds and get them out. Listen, the police will say, we are not ready; they are under investigation. Do you think I jumped up and raised the devil with them? Do you think I said I was a lawyer; I am the mouthpiece? Do you believe you could do it? No, 'Just at your convenience, Mr. Detective, Mr. Captain, Mr. Chief, just at your convenience.' Listen here, I am not saying this man is guilty of manslaughter in the second degree; I am not saying he is guilty of manslaughter in the first degree; I am saying he is guilty of murder and sentence him for life. Listen, I am going to tell you something. Would they even slow down if you would write a verdict of guilty of murder in the first degree and say we find the defendant guilty and fix his punishment at life? Would that slow them down, would that? They would have a respect for the law that they have destroyed. It keeps running through my mind continuously from the time Ben Arnold got him up here and said, 'Did you lie about it?' 'Of course, I lied about it. I didn't have a lawyer.'

"Why does an innocent man want a lawyer? I will tell you lawyers are not dishonest as a rule; witnesses are not dishonest as a rule, but the almighty greed for the dollar makes them all dishonest. Both the little King girls perjured themselves like a lady. Chris King did his today just like a gentleman. Don't you see how they wanted to make a mess out of that? Claude Tyler and Clint Miers say they went to that little girl and asked her if he was there and she said he was not. It didn't happen. She came on the stand and so testified it didn't happen. Who are you going to believe? Why should Claude Tyler perjure himself? Some people don't have any respect for perjuring themselves. I have known Claude Tyler and Clint Miers for some time. They told the truth. It is passing strange she is not working down at Veazey's now; she is up at Roach's.

"I am going to leave this case up to you, gentlemen. I want you to understand that Lewis Morris regrets it the same as we regret prosecuting any man. It is a hard job to take a man and try to send him to the penitentiary, but that is the law. We took an oath to support it; you took an oath. If you violate your oath, why shouldn't we? If we dismissed this case and wouldn't file it we would be criticised for bribery; you know what the public thinks. I think you should write a verdict of life imprisonment. If there is any mercy or any favors or any clemency we have a chief executive for that purpose, but it is your duty to pass on the facts and circumstances and if you write a verdict of not guilty, think about that man hurling through the air three or four times and blood coming from his eyes, nose and mouth and never knew what struck him."

The assistant county attorney, Mr. Grigsby, in his argument repeatedly and seemingly as viciously as it was possible for him to state, urged that the defendant was guilty or he would not have wanted counsel; that an innocent man did not need an attorney, and much of his argu-

ment is taken up upon the question of the defendant's guilt or he would not have asked for counsel.

Section 20, of article 2, of the Constitution of Oklahoma, in part reads as follows:

"In all criminal prosecutions the accused shall have the right to a speedy and public trial by an impartial jury of the county in which the crime shall have been committed: Provided, that the venue may be changed to some other county of the state, on the application of the accused, in such manner as may be prescribed by law."

The same section further states: "He shall have the right to be heard by himself and counsel."

In Howington v. State, 30 Okla. Cr. 243, 235 Pac. 931, this court held that the accused had the right to consult and to be fully advised by counsel of his rights and as to the consequences of his acts before entering his plea.

Section 2670, Okla. Stats. 1931, reads as follows:

"In a criminal action the defendant is entitled: First. To a speedy and public trial. Second. To be allowed counsel, as in civil actions; * * * and, Third. To produce witnesses on his behalf, and to be confronted with the witnesses against him in the presence of the court."

Under the Constitution and laws of this state, the defendant is entitled to have an opportunity to consult with counsel at all stages of the proceedings, from the time he is arrested until the final disposition of the case, and he does not have to make any statement to the officers of the court. He may sit mute and say nothing, and the fact that he does not make a statement to the officers is not and cannot be construed as evidence of guilt, and the state is not justified in arguing to the jury the fact that the defendant did not make a statement. The defendant cannot be com-

pelled to testify, and if his testimony is given, it must be voluntary upon his part. This argument of counsel was calculated to arouse the passion and prejudice of the jury against the defendant, as the argument was not borne out by the law of the state.

It is next urged by the defendant that the assistant county attorney, Mr. Grigsby, by asking questions of his own witnesses and others on the witness stand if they had not made certain statements to the county attorney or other witnesses, and when the witnesses said they had not made the statements mentioned, the county attorney, Mr. Morris, and his assistant county attorney, Mr. Grigsby, failed to follow it up by proof showing that the statements inquired of had been made.

It is the duty of a public prosecutor to bring out all of the facts and to present all of the testimony that he has, but it is not a part of his duty to ask witnesses if they had not made certain statements out of court contrary to their statements made in court, and then when the witnesses deny they made the statement, fail to present testimony showing that they had made the statements inquired of the witnesses by the prosecutor.

This court cannot understand why in a prosecution of a criminal case a public prosecutor, in his zeal to secure a conviction, exceeds his authority under the law and asks questions and makes argument and remarks not borne out by the record, in the presence of the court and the jury, calculated to arouse the prejudice and passion of the jurors to the prejudice of the defendant.

It is next contended by the defendant that the action of the county attorney, Mr. Morris, and his assistant, Mr. Grigsby, in sending out and having the witness Opal

Woden, after she had testified for the defense in open court, taken to the county attorney's office in the absence of the defendant and his attorney, and there interrogated and confronted by the county attorney, Mr. Morris, and his assistant, Mr. Grigsby, and the officers that had the conversation with her on the night after the alleged accident, was improper.

This court has no desire to criticize the officers of the court, and especially the prosecutors who tried this case, but we do feel that they acted improperly in having the witness brought to their office, after she had testified, and was confronted by the officers who claimed to have had the conversation with her. This court cannot interpret the action of the county attorney's office other than that it intended to have the witness taken to the office of the county attorney and there confronted by the officers who had the conversation with her to cause her to change her mind and to correct the testimony she had given in the trial of the case. No other interpretation can be placed upon the action of the county attorney, Mr. Morris, and his assistant, Mr. Grigsby, when you consider the fact that the officers had had the conversation with the witness, Opal Woden, and she had admitted that she had talked to them and the question had been asked her if she did not make certain statements to the officers different from what she had testified to on the stand, and she replied that she had not. The officers knew then as well as they knew when they had seen the young lady in the county attorney's office what statements she had made to them that night, and we feel that it was an effort to embarrass, put in fear, or intimidate her, and force her to change her statement. It was unfair to the defendant and his counsel, and no part of the duty of the county attorney in the earnest and proper prosecution of this case.

It is next urged by the defendant that the assistant county attorney, Mr. Grigsby, in his argument to the jury, made statements and argued facts calculated to inflame the minds of the jurors and to bias and prejudice them against him, and that the argument and statements of the assistant county attorney, Mr. Grigsby, were not borne out by the record and prejudiced the defendant's rights.

Several times in the argument of the assistant county attorney, Mr. Grigsby, he referred to the defendant as a "common criminal," "hit-and-run driver," and finally, in a flight of oratory, he repeated that the defendant was a common criminal, and that he did not want to retract any statement he had made. He also stated to the defendant, "You are the same as an Al Capone gangster." He further continued to criticize and complain that the defendant had not made a statement up to the time that he went on trial.

So far as the record shows, this is the first time this defendant has ever been charged with a crime. The repeated charges of his being a "common criminal," and "that he was the same as an Al Capone gangster," is not borne out by the record, and no act of the defendant as shown by the record bears out these statements. You cannot be a common criminal when there is no showing that you have ever been charged with more than one crime. The statements quoted above are only a few of the many made to the jury in the argument by counsel for the state. Prosecuting officers are sometimes overzealous and appear to be carried away with the idea that they must secure a conviction, forgetting that their highest obligation is their duty to be fair alike to the state and the accused. In this case it is repeatedly referred to in the taking of the testimony and in the argument that the defendant

had the opportunity of an education and had majored in finance, and each time the reference is made, it is made in an insinuating manner, calculated to inflame, bias, and prejudice the minds of the jurors.

In this case the prosecuting officers were learned, competent, and experienced lawyers, and fully conversant with the duties of the office of a public prosecutor. Such conduct as was indulged in by these prosecutors of experience is more serious that if indulged in by one not accustomed to the duties of a public prosecutor. In this connection we do not want to be understood as saying that the prosecuting officers in this case were possessed of improper motives, and we do not believe they were, but it is perfectly apparent that they were more zealous than circumstances demanded or the law permits.

In Hager v. State, 10 Okla. Cr. 9, 133 Pac. 263, in the third paragraph of the syllabus, this court said:

"Where the record shows that counsel for the state in a prosecution of a person charged with crime has been guilty of conduct calculated to arouse prejudice or passion against the defendant and to prevent the accused from having a fair and impartial trial, a conviction had will be set aside, and a new trial granted."

In Watson v. State, 7 Okla. Cr. 590, 124 Pac. 1101, this court, in the second paragraph of the syllabus, division C, states:

"However strong the prosecuting attorney's belief may be of the prisoner's guilt, he must remember that, though unfair trials may happen to result in doing justice in particular cases, yet justice so obtained is dangerous to the whole community. It matters not how guilty a person on trial charged with crime may be, he is entitled to a fair and impartial trial, and a judgment of conviction for murder, and the imposition of a life sentence, would be as

great a wrong to society if unfairly secured, although the accused might be guilty, as it would for such person to go unwhipped of justice."

In State v. Irwin, 9 Idaho, 35, 71 Pac. 608, 610, 6 L. R. A. 716, the Supreme Court of Idaho, citing numerous authorities and cases in which the conduct of the prosecuting attorney was questioned, and after stating some of the questions asked of the accused, said:

"Why, then, did he ask them?" and answering says, "and, if the questions and answers did not help to strengthen the case against defendant, why did not the prosecution consent to have them stricken out? It is quite evident that the questions, and not the answers, were what the prosecution thought important. The purpose of the questions clearly was to keep persistently before the jury the assumption of damaging facts which could not be proven, and thus impress upon their minds the probability of the existence of the assumed facts upon which the questions were based. To say that such a course would not be prejudicial to defendant is to ignore human experience and the dictates of common sense."

In this case the questions propounded to the witnesses insinuated that the witnesses had made statements to the prosecuting attorney and others contrary to what they had stated in court, and could have been made for no other purpose than to impress upon the jury the importance of the prosecution and to impress upon their minds the probability of the existence of the assumed facts upon which the questions were based.

In Cline et al. v. State, 57 Okla. Cr. 206, 47 Pac. (2d) 191, in the second paragraph of the syllabus, this court said:

"It is improper for prosecuting attorney to state his personal opinion as to the defendant's guilt, or state facts not proved by evidence, or otherwise get before the jury that which amounts to his own testimony."

The argument complained of was made by the assistant prosecuting attorney, Mr. Grigsby, in the opening argument, and it cannot be insisted by the state that it was in answer to anything brought out in the argument of counsel for the defendant. The state, in presenting its argument, insists that the argument of the assistant county attorney complained of by the defendant was not properly objected to by the defendant at the time. Many of the most important statements made by the assistant county attorney in the presentation of his argument were objected to by counsel for the defendant, overruled, and exceptions saved. Some of the statements made by the assistant county attorney, Mr. Grigsby, are fundamental, and the court should not have permitted the assistant county attorney to go outside of the record and to give his views as to the guilt or innocence of the defendant, or to permit the assistant county attorney, Mr. Grigsby, to charge the defendant with being a common criminal, in the absence of any proof to sustain such a charge, there being no testimony in the record showing that the defendant had ever been charged with any crime prior to the crime for which he was on trial, that he was an Al Capone gangster, and that he was guilty of murder, and many other insinuating and inflammatory remarks, the personal views of the county attorney.

This court has repeatedly said that as a general rule, in order to make improper argument available as a ground for a new trial, objection should be interposed at the time the prejudicial statements are made; after verdict it comes too late. This court has further said, however, there are exceptions to the rule, and where private counsel assisting the county attorney in his closing argument abuses his privilege and makes statements of prejudicial facts out-

side of the evidence and appeals to prejudices irrelevant to the case, it is the duty of the court to stop him then and there, and it is error for the court not to so direct the jury to disregard such statements.

The court further said:

"It is the duty of trial courts to interfere of their own motion in homicide cases where counsel for the prosecution in argument to the jury abuses his privileges by commenting on matters outside the record, and outside the proof that are calculated to create prejudices against the accused." Holcomb v. State, 16 Okla. Cr. 1, 2, 166 Pac. 755.

It is further urged by the defendant that the court erred in permitting the state to cross-examine its own witnesses without a sufficient showing being made that the defendant was taken by surprise.

"Every defendant in a criminal case is entitled to fair treatment on his trial, and a prosecuting attorney should not be permitted to ask questions which he knows to be illegal * * * or to make remarks in the examination of a witness which contain unfair reflections upon the defendant." Rogers v. State, 8 Okla. Cr. 226, 127 Pac. 365.

The record shows in his opening argument, and throughout the entire trial, the assistant county attorney expressed his belief that the defendant was guilty, that he was a common criminal the same as an Al Capone gangster, and many other statements not borne out by the record; also that the assistant county attorney made many other statements by insinuations and questions attempting to bias and prejudice the jury against the defendant. We believe the action of the prosecuting officer was highly improper and constituted gross conduct on his part. It manifested a disposition to disregard the legal rights of the defendant and exhibited a purpose to ignore the

plainest principles of law in the trial of a capital case. Such insinuations, statements, and expressions, and the conduct of the assistant county attorney, Mr. Grigsby, coming at the time they did, and in the manner made, were highly prejudicial to the substantial rights of the defendant. While public prosecutors should not be restrained in fair argument, comment, or appeal to the jury, they should not be allowed to state facts not proven, or to make inflammatory appeal to the passion or prejudice of or to threaten the jury with popular denunciation if it should fail to convict the defendant. The probable effect of such appeal is to divert the attention of the jury from the evidence, prejudicing them against the defendant, and preventing the exercise of sound dispassionate judgment upon the merits of the case.

In this case the court overruled the objections made by the defendant, and by its action approved the method of taking testimony and the statements of the assistant county attorney. The approval of the assistant county attorney's action by the trial court intensified the effect of such prejudicial remarks. Where the remarks of the county attorney prejudiced the minds of the jury, for that reason alone the judgment should be reversed. Vickers v. United States, 1 Okla. Cr. 452, 98 Pac. 467, and authorities therein cited.

A public prosecutor is presumed to act impartially in the interest only of justice. If he lays aside the impartiality that should characterize his official action to become a heated partisan, and by vituperation of the prisoner seeks to procure a conviction at all hazards, he ceases to represent public interest which demands no victim and seeks no conviction through the aid of passion, sympathy,

or resentment, and the only way to secure a fair trial is to set aside the verdict so procured.

The defendant was not accorded a fair and impartial trial as guaranteed by the Constitution and the laws of our state. It is not deemed necessary to discuss the other errors assigned by the defendant. For the reasons herein stated, the judgment of the trial court is reversed.

DOYLE, J., concurs.   EDWARDS, J., not participating.