Michael Wayne EDENS, Appellant,

v.

The STATE of Oklahoma, Appellee.

No. F–76–860.

Court of Criminal Appeals of Oklahoma.

Jan. 30, 1978.

An appeal from the District Court, Washington County; James H. Laughlin, Judge.

Michael L. Fought, Bartlesville, for appellant.

Larry Derryberry, Atty. Gen., Michael P. Kane, Asst. Atty. Gen., for appellee.

## OPINION

BUSSEY, Presiding Judge:

Appellant, Michael Wayne Edens, hereinafter referred to as defendant, was charged in the District Court, Washington County, Case No. CRF–75–416, with the offense of Unlawful Delivery of L.S.D., in violation of 63 O.S.Supp.1977, § 2–401. He was convicted by a jury and his punishment was assessed at ten (10) years' imprisonment and a Seventy-five Hundred Dollar ($7,500.00) fine. From this judgment and sentence the defendant has perfected an appeal to this Court.

Lester Rogers, a Bartlesville Police Officer, was on patrol on June 30, 1975. When he happened to pull into the parking lot of the Pink Panther, a recreation center, he saw three men standing together. These men were later identified as the defendant, Billy Glen Vice and John Albert.

Although he had seen nothing specific, the behavior of the men led Officer Rogers to suspect that the defendant and Vice had been engaged in a narcotics transaction. Since the officer had seen Vice put something in his pocket, he called the man to the police car and asked him what it was. When Vice showed him two small, purple tablets he decided that an investigation was in order. A crowd was gathering, so Officer Rogers took the three men to the back of the building and called for another officer to assist him. A search of the three men revealed that Vice had fourteen of the small, purple tablets, and the defendant had $28.00 in his shirt pocket. All three men were arrested and taken to the police station. Although the defendant declined to give a statement, Vice and Albert did do so. Vice subsequently testified at the trial, but Albert did not.

Officer Rogers testified that on the next day, acting on information received from Vice, he and several law enforcement officials obtained a warrant for, and searched, the residence which the defendant shared with at least two other people. One L.S.D. tablet was found in the commonly shared living room, and several plastic bags containing small amounts of purple powder were found in the kitchen trash. In the defendant's bedroom the searchers found an apparent inventory list mentioning "pur mes," (seemingly a term for L.S.D.), speed and Valium. This list, however, was not in the defendant's handwriting, and it bore the initials of one of the defendant's housemates.

At the trial Vice testified that he had been the buyer, and the defendant, the seller, and that the chance appearance of Officer Rogers had interrupted the transaction after transfer of the drugs, but before Vice could give the defendant any money. He also testified that he had bought drugs from the defendant on previous occasions; and that on one of these, the day before the arrest, he had seen a plastic bag containing about 1,000 tablets of L.S.D.

The defendant's testimony agreed with that of Vice only in the respect that Officer

Rogers interrupted a drug sale. He maintained however, that it was he who was the buyer, and not Vice. He said that the $28.00 in his shirt pocket was to pay for the L.S.D. The defendant not only denied having ever sold drugs, he also presented evidence that Vice was a drug dealer. He attempted to show that Vice had obtained some sort of benefit from his testimony, in that Vice had not been charged with possession of the L.S.D., nor had a preliminary examination been held in over a year on a charge of possession of marijuana with intent to distribute, which charge had arisen out of the same incident as the instant charge against the defendant.

On rebuttal the State presented evidence to counter the defendant's claim that he had never sold drugs. John Dover testified that he had twice been with Vice when Vice had purchased purple L.S.D. from the defendant. Dover's testimony, however, conflicted in several respects with that given earlier by Vice.

Although the defendant raises twenty-three assignments of error, we do not deem it necessary to treat all of them. The defendant's ninth, tenth, eleventh, twelfth, and fourteenth assignments of error all concern the statement made by John Albert. Albert was a companion of Billy Vice, and was present at the time of the transaction. He was arrested with Vice and defendant Edens, and gave a statement to the police. Apparently the statement was tape-recorded and subsequently transcribed. Albert was subpoenaed for the preliminary hearing, and was to sign the transcription at that time, but failed to appear. Nor did he testify at the trial.

The substance of the defendant's contentions is that although the statement of Albert was never admitted into evidence, constant references to it by the prosecutor, both in his case in chief and on rebuttal, had the effect of creating in the minds of the jury the impression that Albert's statement corroborated Vice's testimony that the defendant was the seller.

The existence of the statement was inadvertently brought before the jury during cross-examination of Officer Rogers by the defendant:

"Q. All right. When you arrested Johnny Albert, did you take down an address for him?

"A. I didn't arrest Johnny Albert.

"Q. You brought him in.

"A. Yes, sir. I took him down to the station to get a statement from him.

"Q. And he made a statement?

"A. Yes, sir. And he give [sic] the same address as Mr. Vice.

"MR. FOUGHT: May I approach the bench, your Honor?" [Tr. 81].

Out of the hearing of the jury, defense counsel requested a copy of the statement, which request was denied. After this, defense counsel asked no more questions concerning the statement. However, on redirect examination, the following transpired:

"Q. Were you present during the statement that Mr. Albert gave?

"A. Yes, sir, I was in and out on that one.

"Q. All right. Would you tell the jury and the Court what Mr. Albert said in his statement—

"MR. FOUGHT: Objection, your Honor. That would be hearsay. Moreover, we haven't been provided with it.

"MR. PEABODY: Your Honor, Mr. Fought has been able to inquire on cross-examination what Mr. Albert said in his statement.

"THE COURT: If you insist on this line of questioning then I'm going to permit him to have a copy of the unsigned statement for cross-examination purposes.

"MR. FOUGHT: I simply asked if the statement was made, your Honor. It's hearsay.

"MR. PEABODY: Officer Rogers, I believe that you have overheard portions of the statement that Mr. Albert gave, is that correct?

"THE WITNESS: Yes, sir.

"Q. Was his statement, the portions that you heard, consistent with the story—

"MR. FOUGHT: Objection, your Honor.

"MR. PEABODY: —that Mr. Vice has given here today?

"THE COURT: That appears to be a backdoor way to get into the same thing and it's objectionable and it's not admissible." [Tr. 84–85].

Thereafter, the prosecutor elicited from detective Ames, one of the officers who interrogated the three suspects, that Albert had given a statement. Defense counsel, however, did not inquire of Ames concerning Albert's statement, although defense counsel did elicit from Ames, and from the defendant himself the fact that the defendant had made an exculpatory remark after he had been informed that Albert and Vice had given statements.

On rebuttal the State presented much evidence tending to show that Albert and Vice were kept separated after their arrest. The following is illustrative:

"Q. Officer Rogers, as far as you know, did Mr. Albert and Mr. Vice have a chance to converse at the police department?

"A. No, there was—

"MR. FOUGHT: Objection, your Honor, this is immaterial.

"MR. PEABODY: Your Honor, we feel it's very material to eradicate any suspicions that may have been raised in the defense's case that Mr. Vice and Mr. Albert had cooked up a story about what happened that evening in question. We are demonstrating, by Officer Rogers [sic] testimony and we will demonstrate by Officer Dillon's and Detective Ames' testimony, that no such opportunity existed.

"THE COURT: Okay.

"MR. FOUGHT: Your Honor, they're claiming a—Mr. Albert isn't here and hasn't been and they're trying to impute something to him that's not—

"THE COURT: You may continue." [Tr. 203–B & 203C].

" * * *

"Q. All right. Did you observe Mr. Albert have occasion to have any conversation with Mr. Vice at the scene?

"A. No, sir. The only talking that was done was between Officer Rogers and myself.

"Q. And you transported Mr. Albert alone to the police department that evening?

"A. Yes, sir.

"MR. FOUGHT: Your Honor, this is immaterial. Mr. Albert isn't here and, as far as I know, isn't going to be here. It has no point whatsoever other than to create some vague impression.

"THE COURT: Well, that's your interpretation, mine is to the contrary." [Tr. 203–F].

■ We are of the opinion that the repeated references to the "Albert statement" were erroneous and were not invited. The questions asked by the prosecutor concerning the contents of Albert's statement, and whether it was "consistent" with the statement given by Vice (which had been introduced through Vice's own testimony), clearly fall under this Court's rule that it is error to repeatedly ask incompetent questions which tend to intimate to the jury that which is not true or which, if true, is not capable of being proved. See, *Neely v. State*, 60 Okl.Cr. 99, 61 P.2d 741 (1936).

Further, we find that the record does not support the prosecutor's contention that the defendant's case raised suspicions that Vice and Albert "cooked up" a story, thereby requiring rebuttal evidence to the effect that Vice and Albert did not have any opportunity to do any "cooking." Rather, the only suspicions raised concerning the Albert statement were those raised by the prosecutor when he asked if Albert's statement was "consistent" with that given by Vice. This being so, then it is apparent that the rebuttal testimony only served to reinforce those same suspicions.

And finally we note that while the State repeatedly attempted to place the contents of Albert's statement before the jury, it apparently made no attempt to locate Mr. Albert and secure his testimony at the trial. Albert's brother, called by the defendant, testified that he knew where Johnny Albert was, and that no investigator for the State had contacted him or, to his knowledge, any of his family about Johnny's whereabouts.

Under *Harrington v. California*, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969), we conclude that this case must be reversed. The facts adduced at trial show that a policeman stumbled upon an apparent drug transaction, although he did not know who was selling and who was buying. Of the three parties to the transaction, only two testified—State's witness Vice and defendant—and each testified that the other was doing the selling. The third party, John Albert, did not testify, although he apparently gave a statement to police when arrested. The State intimated to the jury, successfully we think, that Albert's inadmissible hearsay statement was "consistent" with Vice's story. Although the State's case was corroborated, the corroborating evidence consisted mainly of a showing that the defendant had on other occasions sold or possessed drugs. But the effect of this evidence was considerably weakened by the fact that defense counsel showed that State's witness Vice was a drug dealer as well. Thus viewed, we are unable to state that the errors committed were "harmless beyond a reasonable doubt." *Harrington v. California,* supra.

In closing, it is appropriate to comment on the defendant's nineteenth assignment of error, in which he alleges prejudicial tactics on the part of the District Attorney. During the cross-examination of the defendant the following exchange took place:

"Q. When you were taken to the police department, why did you refuse to give a statement?

"A. Just to keep from getting anybody in trouble.

"Q. Did you, in fact, tell the detective, 'No, I don't want to give a statement. I want to wait and talk to my lawyer'?

"A. I said I wanted a lawyer and—

"Q. Why did you want a lawyer, if you had done nothing wrong?

"A. That, I don't know. I was just—"

▮▮▮ Although questioning in this vein is dangerously prejudicial and can lead to a mistrial or reversal under appropriate circumstances, we find that in the instant case there was no error committed.[1] In the first place, the defendant testified on direct examination that he did not refuse to make a statement, creating an impression of cooperativeness which the prosecutor had the right to rebut. Secondly, the alleged error was not properly preserved for review, inasmuch as there was no objection and the matter was not raised in the defendant's motion for new trial. And finally, when taken in context it can be seen that the defendant's following testimony cured any prejudicial impressions made on the jury by the prosecutor's questions:

"A. That, I don't know. I was just—

"Q. When did you say that Mr. Vice and Mr. Albert were out to get you?

"A. After I heard both of them had signed statements that I had sold it to Mr. Vice.

"Q. And who told you that?

"A. Who told it to me?

"Q. Yes, sir.

"A. I'm not for sure, but I think it was Mr. Ames was one of them that said they'd both signed a statement against me. And then I was willing to give a statement."

The defendant argues that the prosecutor's question was a comment on the defendant's post-arrest silence, in violation of *Thurmond v. State*, 57 Okl.Cr. 388, 48 P.2d 845 (1935) and *Brown v. State*, Okl.Cr., 541 P.2d 242 (1975). In the instant case, however, not only was the comment invited and unobjected to, but the defendant's reaffirmation of the fact that he was willing to make a statement allayed any prejudices

---

1. Clearly, the fact that a defendant chooses to exercise his right to remain silent may not properly be used against him; and it is error to do so. *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976); *Sands v. State*, Okl.Cr., 542 P.2d 217 (1975). However, such error may not always be reversible. See, for instance, *State v. Lynch*, La., 343 So.2d 1062 (1977) (failure to object constitutes waiver of error); *State v. Seeley*, N.H., 368 A.2d 1171 (1976) (admonition to jury held curative); and *State v. Hughes*, Mo.App., 548 S.W.2d 270 (1977), where a defendant testifies he may be cross-examined as to any matter referred to in his direct examination.)

raised in the minds of the jury. This assignment of error is without merit.

Since this case is being remanded to the District Court, and maybe tried again, we note in passing that much incompetent testimony and evidence was introduced in the trial of this case, some of which could have been prejudicial to the defendant. It is incumbent upon defense counsel to object to such material, for only if there is an objection will the trial court be able to prevent the introduction of such testimony and evidence.

For the above and foregoing reasons, the judgment and sentence is REVERSED, and the case is REMANDED to the District Court for a new trial.

CORNISH and BRETT, JJ., concur.

